```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      ) Criminal Action
                                       ) No. 22-cr-378-4
 4                     Plaintiff,      )
                                       ) SENTENCING
 5      vs.                            )
                                       ) Washington, DC
 6      Leroy Frye,                    ) May 31, 2024
                                       ) Time:  10:08 a.m.
 7                     Defendant.      )
        _____
 8
                        TRANSCRIPT OF SENTENCING
 9                          HELD BEFORE
             THE HONORABLE JUDGE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11      _____

                         A P P E A R A N C E S
12
        For Plaintiff:      Justin Song
13                          Joshua Gold
                            United States Attorney's Office
14                          601 D Street NW
                            Washington, DC  20001
15                          (202) 227-9019
                            Email:  Justin.song@usdoj.gov
16                          Email:  Joshua.gold@usdoj.gov

17      For Defendant:      Cary Clennon
                            Cary Clennon, Esq.
18                          P.O. Box 29302
                            Washington, DC  20017
19                          (202) 269-0969
                            Email:  Clennonlegal@hotmail.com
20

21      _____

        Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
22                               Official Court Reporter
                                 United States Courthouse, Room 6523
23                               333 Constitution Avenue, NW
                                 Washington, DC  20001
24                               202-354-3267

25
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2               THE COURTROOM DEPUTY:  Your Honor, we're in criminal

3    action 22-378-4, *United States of America versus Leroy Frye*.

4               If I can have counsel please approach, state your

5    name for the record.

6               MR. SONG:  Justin Song for the United States.  I'm

7    joined by my colleague, AUSA Josh Gold.  Just for the record,

8    he does have to leave at 10:45.

9               THE COURT:  Okay.

10              MR. CLENNON:  Good morning, Your Honor.  Cary Clennon

11   appearing for Mr. Frye, who is present.

12              THE COURT:  Good morning, Mr. Clennon, Mr. Frye.

13              Are we ready to proceed with sentencing?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Okay.  Let me just take a look at this

16   letter that was provided to me from a Dash Yeldo.

17              (Pause.)

18              All right.  I've reviewed the final presentence

19   report and recommendation, as well as a draft.  I've also read

20   the parties' sentencing memoranda, including the defendant's

21   supplemental memoranda and exhibits that were filed under seal,

22   along with Mr. Frye's wife's letter and a letter from Mr.

23   Yeldo.  Are there any other documents -- of course, the

24   government's exhibit, as well, I saw -- are there any other

25   documents that the Court should have reviewed?
```

```
1              MR. SONG:  None from the government.

2              MR. CLENNON:  No, Your Honor.  I believe you've

3     indicated you read the sealed.

4              THE COURT:  The sealed memo and attachments.

5              MR. CLENNON:  Thank you.

6              THE COURT:  Okay.  Mr. Clennon, have you reviewed the

7     final presentence report with Mr. Frye?

8              MR. CLENNON:  Yes, that was disclosed last week?

9              THE COURT:  I believe so.  The final.  I know there

10    was an issue with the criminal history that we can talk about

11    in a minute.  But I'm just wondering whether, the final report,

12    you've had a chance to go over with Mr. Frye?

13             MR. CLENNON:  Yes, disclosed on May 23rd.

14             THE COURT:  Is that the day of the final?

15             THE PROBATION OFFICER:  Yes, Your Honor.

16             THE COURT:  All right.  And other than the issue with

17    his criminal history, do you have any objections to probation's

18    report?

19             MR. CLENNON:  No, Your Honor.

20             THE COURT:  All right.  And, Mr. Frye, is that

21    correct, you've had a chance to review the report with your

22    attorney?

23             THE DEFENDANT:  Yeah.

24             THE COURT:  Okay.  And you've had a chance to correct

25    all inaccuracies in the report?
```

```
 1                THE DEFENDANT:  Yes, we reviewed it.

 2                THE COURT:  I'm sorry?

 3                THE DEFENDANT:  I said:  Yes, we reviewed and

 4   discussed everything.

 5                THE COURT:  Can you speak in the microphone?

 6                THE DEFENDANT:  I said:  Yes, we reviewed and

 7   discussed everything.

 8                THE COURT:  Okay.  Is it factually correct?

 9                THE DEFENDANT:  Like, what do you mean --

10                THE COURT:  Is there anything in that report that you

11   think is factually -- is incorrect?

12                THE DEFENDANT:  On the whole presentence report?

13                THE COURT:  Yes.

14                THE DEFENDANT:  From who?  From my lawyer or from the

15   government?

16                THE COURT:  No, the presentence report prepared by

17   the probation office.

18                THE DEFENDANT:  My employment history, because I've

19   been working longer than what it said in that thing, it said in

20   the report.

21                THE COURT:  So what about it -- did it omit

22   something, the presentence report?

23                MR. CLENNON:  Your Honor, I think in paragraph 109,

24   it indicates that he worked at BJ's for two days, and that was

25   really more like two --
```

1          THE DEFENDANT:  It was, like, seven, eight months.

2          MR. CLENNON:  Seven or eight months.

3          THE DEFENDANT:  And the Bolana was four years that I

4    been there, I want to say.  Like, 2018 -- that's, like, four

5    years from my other job.  I'd say four years, five years.  But

6    it's like 2020 to 2024.

7          MR. CLENNON:  It's four years?

8          THE DEFENDANT:  Yeah.

9          MR. CLENNON:  Okay.  I think that's the main change.

10   Paragraph 111 may not be entirely accurate, but it accurately

11   reflects he spent years working with that organization.

12         THE DEFENDANT:  From 2020 to 2024.  They say 2018 to

13   2022.

14         MR. CLENNON:  Right.  And paragraph 111 should also

15   indicate that he worked for Bolana Janitorial while he's been

16   on pretrial release.  Mr. Yeldo --

17         THE COURT:  Okay.  Wait.  So paragraph 108 reflects

18   the work with the janitorial services?

19         MR. CLENNON:  That's correct.  And he worked there, I

20   think, since he was released.  So that would have been about a

21   year.

22         THE COURT:  All right.  But is there an issue with

23   paragraph 111, given what's in 108?

24         MR. CLENNON:  No.

25         THE COURT:  So the only issue is with respect to

1    paragraph 109, in which Mr. Frye claims he worked for BJ

2    Wholesale Warehouse for how many months?

3            THE DEFENDANT:  Seven to eight.

4            THE COURT:  Seven to eight months, rather than two

5    days.

6            THE DEFENDANT:  Yeah, when had Miss Schuck, was my

7    pretrial officer.

8            THE COURT:  I'm sorry?

9            THE DEFENDANT:  I said around the time Miss Schuck

10    was my pretrial officer.

11            THE COURT:  I know you did not prepare this report,

12    but is there any reason to question what Mr. Frye is saying,

13    that you're aware of?

14            THE PROBATION OFFICER:  Thank you, Your Honor.  Hana

15    Field with probation.

16            No reason to question that.  We did note, Your Honor,

17    that that was what the automated pretrial records indicated.

18            THE COURT:  I see.  So those weren't -- I see.  The

19    basis for what's in the employment record here is coming from

20    the pretrial report?

21            THE PROBATION OFFICER:  From that paragraph

22    specifically.  That was where we located that --

23            THE COURT:  I see.

24            THE PROBATION OFFICER:  -- he had worked there for

25    two days.  But we otherwise have no dispute with his report

1      that he worked there for seven to eight months.

2              THE COURT:  The government have any objection to

3      modifying the PSR to say that?

4              MR. SONG:  No, Your Honor.

5              THE COURT:  All right.  Can we make that change in

6      the report?

7              Anything else in the presentence report, Mr. Frye,

8      that's inaccurate?

9              THE DEFENDANT:  There was -- Bolana, that was for,

10     like, for four years, 2018 to 2022, but it's really, like, from

11     2020.  But I don't know who wrote it like that.  It's still,

12     like, four years I got, but it just, like, miscalculated --

13             MR. CLENNON:  I thinks he's saying it should be 2020

14     to 2024.

15             THE COURT:  Instead of 2018 to 2022?

16             MR. CLENNON:  Correct.

17             THE COURT:  So you've been working for Dash Junk

18     Removal currently?

19             MR. CLENNON:  I'm sorry, Your Honor.  And I apologize

20     for not having clarified this in the original objections.  He

21     worked with Dash and Bolana simultaneously.  They're both

22     operated by the same gentleman, whose letter you just read,

23     Mr. Yeldo.  He was not able to return to Dash in 2023 when he

24     was released because of the stay-away order from the District.

25     Mr. Yeldo could not assure us that he wouldn't have landscaping

1     assignments in the District.  And so I think he left the

2     landscaping at that point.  But Mr. Yeldo was able to hire him

3     at Bolana once the stay-away order was lifted from the

4     entire --

5              THE COURT:  So how do we need to change paragraph 111

6     to make it accurate?  Between 2020 and 2024?

7              THE DEFENDANT:  Yeah, that's it.

8              THE COURT:  Doesn't have to be constantly.

9              MR. CLENNON:  I believe that's correct.

10             THE COURT:  So I would ask that probation modify

11    paragraph 111 to say between 2020 and 2024 he reported working

12    for.

13             THE PROBATION OFFICER:  Yes, Your Honor.

14             THE COURT:  Okay.  Anything else, Mr. Frye?  Thank

15    you for these corrections.

16             THE DEFENDANT:  No, no.

17             THE COURT:  Okay.  Any objections from the government

18    to the presentence report?  Let's put aside the criminal

19    history issue.

20             MR. SONG:  Aside from the criminal history issue,

21    nothing, Your Honor.

22             THE COURT:  All right.  So the Court will address the

23    criminal history issue, that dispute, in just a moment, but I

24    otherwise accept the presentence report as my findings of fact

25    under Rule 32.

1          The sentencing guidelines apply in this case.

2     They're advisory, but I must correctly calculate them before

3     deciding whether to depart or vary from the guideline range.

4     So looking at the --

5          MR. SONG:  I'm sorry, Your Honor.  I also wanted to

6     note, we also are seeking the enhancement as well.

7          THE COURT:  I understand.

8          MR. SONG:  Just in case that wasn't clear.

9          THE COURT:  No, I just am talking about facts in the

10    PSR.

11         So I will address both the criminal history issue and

12    the other felony enhancement before I state the guideline

13    range.  Now, both parties do agree with probation, that the

14    base offense level is 2K2.1, it's a level 24.  Both agree that

15    there's a three-level adjustment downward for acceptance of

16    responsibility.  And the government also believes there's a

17    four-level enhancement for the gun being possessed in the

18    course of another felony, namely, drug trafficking; correct?

19         MR. SONG:  Correct, Your Honor.

20         THE COURT:  All right.  So let's first address the

21    criminal history issue because there's been some back and forth

22    here.  Initially I think probation had indicated that Mr. Frye

23    was in a Criminal History Category IV, that then changed before

24    the final.  Probation changed it to a III, but probation now

25    believes its original calculation was correct and that Mr. Frye

1     is actually a Criminal History Category IV.  And this debate

2     stems from the amount of time that Mr. Frye served for a

3     conviction that is reflected in paragraph 67, is that correct?

4               THE PROBATION OFFICER:  Sixty-nine.

5               THE COURT:  Sixty-nine.  And that is the distribution

6     of a controlled substance, cocaine, the 5-3-2017 conviction.

7               Mr. Clennon, I know that you've done a lot of work

8     here to try to demonstrate to the Court that Mr. Frye did not

9     served as long of a sentence as probation is now saying he did.

10    The issue is whether he served enough to get the two-point

11    enhancement under Section 4A1.1.  And probation is now saying

12    that he served 442 days.  And that's based on the commitment

13    orders, correct?

14              MR. CLENNON:  (Nods head.)

15              THE COURT:  And how can the Court second-guess the --

16    effectively, the judgment, without, you know, a motion to amend

17    that judgment?  I mean, how can I go recalculate the --

18              MR. CLENNON:  The judgment is correct, the commitment

19    orders are correct.  The tally of days that were served under

20    the commitments is correct, it's over 400.  But not all of them

21    accrue to the time-served sentence for a very simple reason.

22              On October 23rd he had those two pending cases.  One

23    of them is not counted at all because it was all one case.

24    They went out, they made four buys, they got an indictment,

25    they went out, arrested him, he had more drugs, so that became

1    a second case.  But it was all one incident, they were not

2    separated by arrests.  It was all sentenced on the same day so

3    it's treated as one conviction.  They both pended at the same

4    time, they both came in at the same time, they went to court

5    every time the same dates.

6           On October 23rd he was arrested in -- a year later --

7    he was arrested in October of 2017.  In October of 2018 -- and

8    when he was arrested has parole violation warrant from his 2010

9    conviction was still outstanding.  So he's held for a year,

10   from October 2017 to October 2018.  On October 23rd he's

11   ordered released, and it's for the specific purpose to get the

12   federal warrant detainer executed.  And that's exactly what

13   happened.  And the D.C. docket sheet in Exhibit D reflects that

14   in the highlighted entries.  And when he was sentenced, about

15   three weeks later, by the parole commission, he was given one

16   year of supervised -- of revocation time.  One year.

17          He served from October 24th to October 23rd, 2019 and

18   was released from BOP.  All of the time between October 22nd --

19   or, October 23rd, when he was committed, and October 22nd the

20   following year when he was released, each one of those 365 days

21   was credited to his 2010 sentence.  None of his other sentences

22   ran concurrent with that sentence.

23          So on October 23rd, when he was released, he'd served

24   372 days; one year, plus a week the year earlier when he was

25   released after the detention hearing.  So he served 372 days.

```
1    On October 26th he returned to court.  He never got out of the

2    jail.  He came over here and was arrested and then he -- three

3    days later he went back to Superior Court in both cases for a

4    status hearing and was recommitted.  And he remained

5    recommitted until he was sentenced in January to time served.

6    But none of those days between October 26th and January 4th

7    receive any credit against the sentence because every one of

8    those days was credited to his 2010 sentence.

9              THE COURT:  Wait.  Which days were not credited to

10   his --

11             MR. CLENNON:  October 26, 2018 to his sentencing

12   date, January 4th, 2019.  All of those days he was committed on

13   both cases and that's why it goes from 372 to four-something --

14   420, I think.

15             THE COURT:  So you're saying that time period that

16   was not credited, that's because it went to what offense?

17             MR. CLENNON:  It went to the 2010 sentence, the

18   supervision revocation case that dragged on for nine years.

19             THE COURT:  But the commitment order reflects that he

20   served 442 days, correct?

21             MR. CLENNON:  The commitments, yes.

22             THE COURT:  Okay.

23             MR. CLENNON:  But from October 26th to January 4th or

24   January 19th -- I don't remember the exact date in January --

25   he was already serving on his 2010 sentence.  So because the
```

1   2017 sentences were never made concurrent to the 2010, he can't

2   earn credit on three cases at the same time, unless the

3   sentences are concurrent.  All of his time from the day he pled

4   guilty, October 23rd, to the day he was sentenced, January 4th,

5   none of those count against his sentence because all of them

6   were going to the 2010 sentence that effectively began on

7   October 23rd, when he was arrested on the federal parole

8   warrant.  And that's shown on Exhibit D.

9           THE COURT:  And your basic point is because the 2017

10  offense did not state that it was running concurrently to the

11  2010, is that the issue?

12          MR. CLENNON:  Right.  Right.

13          THE COURT:  And because it didn't state that, you're

14  saying that time that he absolutely did serve for the 2010,

15  that can't be considered as part of the sentence for the

16  2017 --

17          MR. CLENNON:  Correct.

18          THE COURT:  -- is that right?

19          MR. CLENNON:  Correct.  Both sentences are

20  consecutive and --

21          THE COURT:  It reflects that these are consecutive

22  sentences.

23          MR. CLENNON:  That's by operation of law.

24          THE COURT:  The judge didn't say "concurrent."  He

25  would need to say, or she, would need to say "concurrent" to

1    run them concurrently?

2              MR. CLENNON:  Yes, concurrent sentences have to be

3    ordered --

4              THE COURT:  All right.  Let me hear from Mr. Song.

5              Mr. Song, if Mr. Clennon is correct and the judge did

6    not run the later sentence concurrently with the other

7    violation, why is the time-served not excluding that one year?

8              MR. SONG:  So, just first, for the record, the

9    judgment and commitment order did not specify 442 days.  So

10   just to clarify that.

11             THE COURT:  Time served?

12             MR. SONG:  Right.  It just says 16 months, execution

13   of sentence suspended as to all but time served.  And so I

14   think that's a lot of the source of confusion, right?  Like

15   this judgment and commitment order did not spell out exactly

16   what it was considering when it was issuing a time-served

17   sentence.  And so I think Mr. Frye and Mr. Clennon would be

18   right, but for one fact.

19             He was affirmatively reincarcerated by the Court on

20   October 26th of 2018, as seen in Exhibit 2, and then

21   affirmatively reincarcerated again on November 16th of 2018.

22   That's our Exhibit 3.  We submitted those exhibits to show that

23   the -- that was issued by the Court presiding over

24   2017-CF2-7677, which is the conviction in paragraph 69.

25             So I think our position is simple, it's that a

1    time-served sentence encompasses all the times that he was

2    serving prior to the imposition of the sentence.

3        THE COURT:  But is his point that the Court would

4    have needed to say it runs concurrently with that earlier

5    sentence imposed?  I mean, is that a missing magic word that

6    needed to be stated?

7        MR. SONG:  Not -- I do not understand the argument

8    that an individual cannot be receiving credit on multiple cases

9    at the same time.  I don't understand that argument and I don't

10   understand why a Court would need to affirmatively declare that

11   a case runs concurrent in order to receive credit on it,

12   especially when the sentence is time served.

13        So, for example, the Court could have, for example,

14   not issued a separate commitment order, as we see in Exhibit 2

15   and 3.  That would clearly make it so that that time was not

16   being calculated as part of time served because he was not

17   committed in that case.  And courts regularly do that in the

18   D.C. Superior Court because, especially in this circumstance

19   where Mr. Frye was being held as part of another matter,

20   Courts -- you know, a Court would have to not enter the

21   commitment order for that time to not run.  I hope I'm making

22   sense on that point.

23        THE COURT:  No, I'm not really familiar with how

24   Superior Court works on this point.

25        MR. SONG:  So, for example, my understanding is that

1    when a commitment order is placed -- is entered on the docket

2    by the Court, that means that that individual is being

3    committed in that case specifically.  And so I'm -- in the

4    government's argument, we're just referencing the docket from

5    the conviction in paragraph 69.  We're not looking to the other

6    dockets.

7              For example, we're not looking at the 2010 parole

8    revocation.  Our position is that that's irrelevant.  The only

9    thing that is relevant is the time that he served in that

10   specific conviction itself.  And we think that by the entry of

11   those commitment orders in Exhibit 2 and Exhibit 3, that it's

12   clearly an intention to have Mr. Frye incarcerated in that case

13   specifically.

14             And I think that makes sense.  For example, why would

15   a judge not want an individual to get -- to be accruing time

16   on -- you know, notwithstanding the fact that they are

17   incarcerated, I think it's generally -- my experience in the

18   Superior Court is that judges want these individuals to be

19   getting credit for their time that they're serving.  I think

20   that --

21             THE COURT:  You're saying there's two separate

22   commitment orders in the 2017 case.  So one on what date?

23             MR. SONG:  So the first one -- I'm not sure if it's

24   the first one on the docket.  I can actually pull up the

25   docket, if it's useful for you to see.  But, if not -- so the

1    dispute is around the time period between October 26th to

2    January 4th, 2019.  That's the dispute.  Because prior to that,

3    I think both parties agree that he served 371 days.

4              THE COURT:  Do you agree with that, Mr. Clennon?

5              MR. CLENNON:  Yes.

6              MR. SONG:  So really, it's this time period between

7    October 26th of 2018 and January 4th of 2019.  And so Mr. Frye

8    was reincarcerated in his case on October 26th of 2018.  That's

9    Exhibit 2 that we submitted.  He was released 20 days later, on

10   November 13th of 2018.  But the docket shows that he was still

11   incarcerated.  So he was still incarcerated, he was just

12   released as a sort of -- what I would call like a legal

13   fiction, to deal with his parole warrant.  That is a practice

14   in Superior Court because oftentimes the parole commission will

15   not act --

16             THE COURT:  Execute the detainer?

17             MR. SONG:  That's correct.  Yes.

18             THE COURT:  So he's not really released.

19             MR. SONG:  He's not really released, he's still

20   incarcerated.  So that release order was filed November 13th of

21   2018, so we're at 20 days now.  We agree the time that he was

22   released does not accrue under the time-served sentence.  But

23   then he was recommitted, affirmatively recommitted by the Court

24   on November 16th of 2018.  That's Exhibit 3.  And then from

25   there he stayed incarcerated until January 4th of 2019.  So the

1    second period is an additional 50 days.  So now we're at a

2    70-day total, in addition to the 371 days that's not in

3    dispute.

4            THE COURT:  And that makes him eligible for the --

5            MR. SONG:  The three points, that's correct.

6            THE COURT:  -- the three points.

7            MR. SONG:  So that's my understanding of it.  I think

8    that the Court can just purely look at the docket for paragraph

9    69 itself in making this determination.  I don't think that in

10   calculating time served, how much time an individual has served

11   in a single case, I don't think it makes sense to reference

12   other cases.  And, in addition, I think that the general policy

13   is that, you know, Courts want a defendant to be receiving the

14   benefit of time -- of time being incarcerated.  I think it

15   would be actually quite strange for an individual to be serving

16   time, not getting time for -- accrued as to their sentence.

17           THE COURT:  I know this can happen, and it's

18   frustrating when it does happen, but when defendants are moving

19   from state to federal court, right?

20           MR. SONG:  Right.

21           THE COURT:  There are occasions where -- I know I've

22   wanted to -- probation will remind me what the issue is.  There

23   are times when I want them to get credit, but they can't

24   because they're in Superior Court.  Or is it the other way

25   around?

1          THE PROBATION OFFICER:  Is it a detainer, Your Honor?

2          THE COURT:  No, I'm just remembering when I have a

3     defendant who's in both courts and there are times when -- I'm

4     just confirming the inclination that a judge does want a

5     defendant to get credit for the time they're being locked up on

6     that case.  And occasionally it's frustrating and I can't

7     remember the way in which --

8          MR. SONG:  I can explain that.  I think the reason

9     why -- I've come into that problem, too.  So the reason why is

10    when a case is initially charged in Superior Court and then

11    brought up to Federal Court, it requires a dismissal of the

12    Superior Court case.

13         THE COURT:  Right.  And so we can't credit that time.

14         MR. SONG:  That's correct.

15         THE COURT:  That's the frustrating thing.  So the

16    defendant -- say a gun charge starts over in Superior Court,

17    you all have it for nine months over there, decide, for

18    whatever reason, to dismiss it, and then they come over here

19    and it's the same offense and we have to then depart.  We can't

20    just say credit for time served across the street.  Is that

21    correct, probation?

22         THE PROBATION OFFICER:  Your Honor, I believe the BOP

23    does give credit as long as it's clearly stated that the only

24    offense for which they were being held in Superior Court, if

25    that was the only offense they were being held in Superior

1    Court, they would get credit for that, as long as it's

2    specifically stated.

3          THE COURT:  Maybe that comes into play then.  It's

4    essentially the same crime, but it's a different charge in

5    Superior Court and comes over here.

6          MR. SONG:  Understood.

7          THE COURT:  But I know that there have been times

8    when Courts here are even encouraged by the government to

9    depart, to give the defendant credit for time they have over in

10   Superior Court.  You're saying that these two commitment

11   orders, one on October 26 of 2018 and another on November 16th

12   of 2018, indicates an intention by the Court to credit him?

13         MR. SONG:  To have him committed, affirmatively

14   committed in paragraph 69 and him receive credit.

15         THE COURT:  Right.  Okay.

16         All right.  Mr. Clennon, the period of time you're

17   disputing runs from November 13th?

18         MR. CLENNON:  October 23rd.

19         THE COURT:  October 23rd.

20         MR. CLENNON:  When he was booked on the parole

21   violation warrant in Federal Court on his 2010 case.  Two or

22   three weeks later, Parole Commission sentenced him to one year.

23         THE COURT:  And this is in Federal Court?

24         MR. CLENNON:  No, it's the United States Parole

25   Commission.

1          THE COURT:  Okay.  But you said -- oh, his new case

2     in Federal Court?

3          MR. CLENNON:  No, it's a DOC condition of parole

4     felony.  I -- it's not Federal Court, but it's the Federal

5     Parole Commission.

6          THE COURT:  Understood.

7          MR. CLENNON:  On October 23rd, when he was released

8     in his 2017 cases, procedurally -- not physically, but on

9     paper -- he was released so that the federal detainer would be

10    executed, and it was.  And Exhibit D shows, on October 23rd --

11         THE COURT:  The parole detainer.

12         MR. CLENNON:  The parole detainer was executed.  A

13    couple of weeks later he was sentenced on that to one year.

14    They gave him credit October 23rd, 2018, to October 22nd, 2019,

15    when he was released.  Every single day of that year is

16    credited to the 2010 case.  He cannot earn multiple credit

17    after October 23rd on the second commitment.

18         THE COURT:  But why?

19         MR. CLENNON:  Because the sentences have to be

20    concurrent.

21         THE COURT:  Do you have any authority that says

22    when -- the Court is clearly committing him back in.

23         MR. CLENNON:  It's detention.  It's simply pretrial

24    detention.  It's not incarceration on a sentence.  He's held in

25    three cases at the same time.  If the sentences end up being

1    consecutive, he's only going to get credit for one day for one

2    case and when that ends, they'll start counting the days for

3    the second case.  The only -- the reason -- your last statement

4    before Mr. Song sat down was that you have to depart to give

5    him credit for the nine months that he spent over in Superior

6    Court.  That's because BOP will not credit any days in a

7    different case, in a different courthouse, on a different

8    commitment order and a different case number.  It doesn't

9    happen.  That's why you have to depart to give that credit.

10            THE COURT:  In the same court, different case, you're

11    saying it's the same issue?

12            MR. CLENNON:  It's the same issue.  It's -- they're

13    not the same cases.  One is 2010 and one is 2017.  So he can

14    only serve one sentence at a time when the sentences are

15    consecutive.  And because 2017 was never made concurrent to

16    2010, he doesn't earn any credit for all the days of pretrial

17    detention that he was committed from October 26th to November

18    13th and then again from November 16th to January 4th.  During

19    that entire time period, every day is going to the 2010

20    sentence, on the revocation sentence.  So he doesn't get any

21    credit after October 23rd.

22            THE COURT:  So you're saying unless that judge at

23    sentencing said -- you think the judge would have had authority

24    to say this would run concurrently with the violation for the

25    parole?

1           MR. CLENNON:  The 2010 sentence and any other case,

2     she can make it concurrent.

3           THE COURT:  She could have said that, but she didn't.

4           MR. CLENNON:  Right.

5           THE COURT:  And because she didn't, that is just like

6     a detention order for pretrial detention?

7           MR. CLENNON:  It has to be.  That's my position.

8           THE COURT:  Does probation want to add anything?  I

9     know, Ms. Field, this is not your case, but I appreciate you

10    standing in here.

11          THE PROBATION OFFICER:  Absolutely.  Just briefly,

12    Your Honor.  I think it may have been mentioned, but we also

13    reviewed the commitment and release orders which specifically

14    state that he is committed in the 2017 case and released from

15    the 2017 case.  So just to reiterate, that each commitment and

16    release order specifies the 2017 case for which he was to be

17    committed and released.

18          THE COURT:  But what about Mr. Clennon's point that

19    this is just like a pretrial detention order?  No?

20          THE PROBATION OFFICER:  I don't know about that, Your

21    Honor.  The judgment reads for him to get credit for time

22    served.  And in reviewing the commitment and release orders for

23    the 2017 case, those are the dates and that's how we came up

24    with the 442 days of time served.

25          THE COURT:  Do you think that the judge

1    effectively -- although he or she didn't say "concurrent" --

2    did that by virtue of the commitment orders?  Do you agree with

3    Mr. Clennon that the default is a sentence is consecutive

4    unless stated otherwise?

5            THE PROBATION OFFICER:  That I don't know.

6            THE COURT:  Okay.  Well, I think in this court -- in

7    this court, if I were to impose a time-served sentence and a

8    defendant had also, in the interim, been revoked by another

9    judge here -- I don't know that this would actually happen in

10   practice in this Court -- but, I think they usually do that

11   either before or after the prosecution, at least in my

12   experience.  They don't do it in the middle, which is very odd.

13           And often defense wants to do it before, so that on

14   the violation they don't have an additional conviction, right?

15           THE PROBATION OFFICER:  Right.

16           THE COURT:  So I don't know that I've faced this

17   issue, but just hypothetically, if a similar issue happened

18   with another judge here on this court and I didn't -- I would

19   have to say this runs concurrently?  Because we don't really

20   have a commitment order process here.  There would be -- which

21   I don't understand because he's in -- I guess because the

22   Parole Board is federal, that's why there was this fiction of

23   re-committing him, because even though he was in the same

24   courthouse and same jurisdiction, it was considered federal

25   because of the Parole Board?

```
 1              THE PROBATION OFFICER:  I believe so, Your Honor.  I
 2    know we reached out to the Parole Board for their records, but
 3    we didn't receive any.  So this is just based on the limited
 4    information that we have received.  I believe -- and I can pull
 5    up my guidelines manual, but I believe it is recommended that
 6    sentences run concurrently.
 7              THE COURT:  That's in this case, but not like a
 8    previously served sentence.  I think I have to say it's run
 9    concurrently or it will be consecutive.  I think Mr. Clennon is
10    right about that.  Does the government agree with that?
11              MR. GOLD:  I think so, Your Honor.
12              THE COURT:  I think that the default is consecutive.
13    Even if that was the intent of the judge to do what the
14    government is saying, why isn't Mr. Clennon right that by not
15    saying concurrent, he or she basically changed her -- his or
16    her mind?
17              MR. GOLD:  Your Honor, Josh Gold, for the record.
18              We also don't have what the Parole Commission said
19    when they did their revocation.  So the Parole Commission
20    presumably knows he has this other case.
21              THE COURT:  All right.  But we're at sentencing now,
22    so someone needed to get that for me before now.
23              MR. GOLD:  I guess the question would be:  Who has
24    the burden?
25              THE COURT:  You're seeking --
```

1           MR. GOLD:  Well, actually, Mr. Clennon is seeking the

2     modification from the -- I mean, we need to get it right,

3     but --

4           THE COURT:  I don't really care who has the burden.

5     We need to get it right.

6           MR. GOLD:  In the same way that Mr. Clennon is saying

7     that this could have been spelled out in one judgment and

8     commitment order, the same is true in the other commitment

9     order.

10          THE COURT:  The final judgment doesn't say

11    concurrent.

12          MR. GOLD:  The other judgment could have run current.

13    I mean, that's the problem, we don't have the records from the

14    Parole Commission, unless Mr. Clennon does.  It sounds like

15    probation --

16          THE COURT:  But why would the Parole Board records

17    show this, because --

18          MR. GOLD:  It's a judgment and commitment order, so

19    they --

20          THE COURT:  They would have committed him to the

21    year, or whatever they did, that no one is disputing, right?

22    But the real issue is when he comes back to Superior Court, is

23    that Court trying to give him credit for that sentence?  Right?

24    So I don't think the Parole Board's records are going to inform

25    anything.  It's what the judgment in this 2017 case was.

1          MR. GOLD:  Well, I guess the Parole Commission

2     could -- look, the Parole Commission's judgment and commitment

3     order could have said 12 months, to run concurrent to whatever

4     he ends up serving in that case.

5          THE COURT:  I think the judge who sentences later --

6     I know a federal court can prospectively tell a Superior Court

7     judge that this is going to be consecutive.

8          MR. GOLD:  I guess the point is, I don't -- we

9     don't -- I agree with Mr. Clennon's statement though.  And I

10    think Mr. Song and I, having discussed it, like, if you're

11    serving two sentences and being held in two cases at the same

12    time, you're sentenced on the same day in two completely

13    separate cases that you were held in and given incarceration

14    with credit for time served, but they are supposed to run

15    consecutive, the time served, Mr. Clennon is correct, will only

16    be counted in one of the cases.  And then the other one will

17    stack on top of that.

18          But I guess the government's problem is I think we

19    have -- we feel like we don't have the information because we

20    have -- all we have is the docket which says when he was being

21    held in that case and that equals more than 12, 13 months.

22          THE COURT:  Mr. Clennon?

23          MR. CLENNON:  He just explained it.  If he's

24    sentenced on two cases at the same time and given credit for

25    time served but they're consecutive, he's only going to get

1    credit for all the days of his commitment on one of those

2    cases.  He's committed in two cases, but he's only going to get

3    credit on one because the sentences are consecutive.

4        THE COURT:  Because the judge failed to say

5    concurrent.

6        MR. CLENNON:  And that wasn't her intent, I don't

7    believe.  The more important point is, we have the records from

8    the Parole Commission, they're included in the presentence

9    report on paragraph 67.  When he was released on October 23rd,

10   the D.C. Department of Corrections' face sheet, which is my

11   Exhibit D, on the second page, the second entry is DOC

12   condition of parole, felony, U.S. parole violation, Superior

13   Court, committed 10-23-18.  He is then sentenced in November to

14   12 months of imprisonment.  The parole commission has no

15   authority to make their sentences concurrent, only the judge

16   can do that.

17       THE COURT:  Okay.

18       MR. CLENNON:  So they give him 12 months, he's

19   released on October 22nd, 365 days, 12 months after he was

20   committed on the parole violation warrant on October 23rd.

21   That's why all of the days from October 2018 to October 2019 go

22   to the 2010 sentence.  And even though he's committed on two

23   other felony cases, he's not earning any sentencing credit on

24   any of those days from October 23rd until January 4th.

25       MR. SONG:  I think, Your Honor, at this point the

1    government's willing to concede to a two-point --

2            THE COURT:  I think that's where I was going to land

3    anyway.  I think, given that the judgment doesn't clearly

4    reflect that this was to be concurrent with the time that was

5    served for the violation imposed by the Parole Board, I am not

6    going to impose 4A1.1(a), the three-level enhancement.  So this

7    would change his Criminal History I category, correct, to a

8    category III.

9            So the remaining issue is whether the Court enhances

10   the defendant's sentence based on the drugs in the apartment

11   and the clear drug trafficking that was occurring in this

12   apartment.

13           All right.  This is the government's burden, correct?

14   Probation hasn't found it in its enhancement.  You can come on

15   up, Mr. Song.  If I get your argument right, Mr. Clennon has a

16   clever argument, looking at each text in isolation, what it

17   could have meant.  But it seems the government's point is

18   looking at the texts as a whole, looking at the fact Mr. Frye

19   had cash on his person, his fingerprints were found on the

20   firearm with the other firearms that were in the kitchen --

21           MR. SONG:  It was his DNA.

22           THE COURT:  Sorry, his DNA.  And that is in fact what

23   he pled to, his possession of that firearm.

24           MR. SONG:  That's correct.

25           THE COURT:  And just looking at all of that as a

1    whole -- and I think, although the Court wouldn't have to rely

2    on this, but, the Court also, I think, can take into account

3    his prior convictions.  Not in saying he was drug dealing here,

4    but at least in suggesting that his intent in being inside the

5    apartment was -- you know, he could have had the intent to

6    traffic drugs, as he had done in the past.  But I don't think

7    that's necessary.

8              But I think the real issue is Mr. Clennon's breaking

9    down each little piece of evidence separately, rather than

10    looking at it as a whole.  I'm inclined to agree with you.  But

11    am I missing anything else?

12              MR. SONG:  I think that's accurate.  That's one of

13    our arguments.  There's also a second argument that I think

14    this Court can rely on and it's just looking at the plain text

15    of this enhancement.  We laid it out in our sentencing memo,

16    but there's a commentary portion to 2K2.1.  That appears on

17    page 261 of the 2023 guidelines, and it's all the way at the

18    bottom.  And so this note, comment 14 note, subsection B, says

19    that:  This enhancement applies, according to (ii), in the case

20    of a drug trafficking offense in which a firearm is found in

21    close proximity to drugs, drug-manufacturing materials, or drug

22    paraphernalia.  In these cases, the application of the

23    subsection is warranted because the presence of the firearm has

24    the potential of facilitating another felony offense or another

25    offense, respectively.

```
1          So I think just looking -- even simplifying it down,

2    looking at the text of the sentencing guidelines itself gives

3    the Court a basis to provide this enhancement here.

4          THE COURT:  And the firearm was found in the kitchen,

5    where the fentanyl and the crack --

6          MR. SONG:  That's correct.  The firearms were found

7    in the kitchen drawer and then the fentanyl and the crack and

8    the marijuana, empty bottles of promethazine were all located

9    in the kitchen as well.

10          THE COURT:  Okay.

11          MR. SONG:  Yes, absolutely, we are arguing that by a

12    preponderance of the evidence there is sufficient evidence, as

13    we proffered in our memorandum, to find that Mr. Frye was

14    engaged in drug trafficking at the time he had possessed this

15    firearm in 215 K, but we also want to make the argument that by

16    the plain text of the sentencing guidelines, and the commentary

17    actually guides this Court to apply this guideline enhancement

18    as well.

19          I'm happy to answer any specific questions, but, if

20    not, that was the basic thrust of our argument.

21          THE COURT:  Mr. Clennon?

22          MR. CLENNON:  Your Honor, I think the conclusion that

23    the government jumps to is sort of illuminated in their

24    memorandum when they say that all the text messages and the

25    surveillance shows that Mr. Frye has a presence.  And that's
```

1    true.  Just like I.F., Ms. Fuller, whose apartment it was.  She

2    has as much connection to the drug conspiracy as Mr. Frye does.

3            THE COURT:  But he's got these texts that are very

4    hard to explain away in a way that --

5            MR. CLENNON:  Did you say "past"?

6            THE COURT:  Text.

7            MR. CLENNON:  That's five, four years before.  After

8    being released in 2019, he successfully completed his

9    probation.

10           THE COURT:  All of these texts, none of these were

11   relating to --

12           MR. CLENNON:  Oh, the texts.  The texts.  I thought I

13   explained that the texts --

14           THE COURT:  You have explanations for each, but -- I

15   think that they're clever, but I thinking looking at all of

16   this as a whole --

17           MR. CLENNON:  They're just as consistent with him

18   being there for the purpose of buying drugs because he's a drug

19   addict.  The government, after they did the raid on 225, they

20   applied for a search warrant on somebody's phone and they write

21   out this thing about the violent drug gang and they listed 10

22   or 12 people who were identified and they were under

23   surveillance for four months.

24           Mr. Frye is barely mentioned in any of the

25   observations.  And when they do make a mention, oh, he came and

1    met somebody and exchanged some objects.  There's, like, two of

2    those observations in four months, but no one is ever stopped.

3          It's barely reasonable articulable suspicion.  It's

4    certainly not probable cause and it's certainly not evidence

5    because there's no evidence there were drugs.  He's in the

6    neighborhood, he's --

7          THE COURT:  As a whole, he's got a large amount of

8    cash on him.

9          MR. CLENNON:  That money is explained by betting

10   slips.  Police officers threw them away, but they talked about

11   them in the interrogations.  He had just come from Capital One

12   and cashed slips.  But they're all involved in doing that.  He

13   had winning slips on him, but they were gone by the time --

14         THE COURT:  His gun, with his DNA that he's pled to,

15   was right by all the drugs.  What about the gun in that

16   argument?

17         MR. CLENNON:  Actually, I'm glad you brought that up

18   because the position of the drugs and the guns actually shows

19   the guns were not intended for use in furthering the drug

20   trafficking crime.  It reminded me, when I first read it, I

21   said, well, that's unusual.  How are they going to repel an

22   armed home-invasion robbery when the guns are in a drawer?

23         THE COURT:  They're always hidden.  In every drug

24   case I have, they're not lying in plain view on the countertop,

25   they're within -- they're behind a refrigerator, they're in a

1    drawer.

2            MR. CLENNON:  They are both in plain view in the two

3    prior times he was arrested, one in 2015 and July of 2021.

4            THE COURT:  I'm just saying in my experience in this

5    court, the guns are typically not in plain view.

6            MR. CLENNON:  To my experience, three guns in a

7    drawer is like Tombstone gun control.  The homeowner or the

8    person in charge is saying we're not having any gunplay in

9    here, check your guns, and they put them all in the drawer.  If

10   they're going to repel a home invasion, they've got to be

11   armed.  And being upstairs, Mr. Wade was armed, upstairs.  But

12   the other two guys, their guns were in the drawer.  Nobody has

13   access.  Can you imagine three people running to the same

14   drawer?

15           THE COURT:  It doesn't have to be a home invasion, it

16   could be when you're dealing with drugs you're armed and when

17   you're not dealing in drugs, you're not.

18           MR. CLENNON:  But it wouldn't be enough to get a

19   924(c).  Proximity is not --

20           THE COURT:  I'm not sure a gun in a drawer, just like

21   a gun in a, you know, center console of a car, you still have

22   to open it up, but it's within reach.  It's --

23           MR. CLENNON:  Right.  But if he's in a separate room,

24   it's not within reach.

25           THE COURT:  At that moment, yeah.  Copeland -- you

1    know, there was initially a conspiracy charge, wasn't there?

2    Copeland is in the kitchen with guns that are within reach.

3    Mr. Frye wasn't in the kitchen at the time.

4            MR. CLENNON:  But Mr. Frye is not charged --

5            THE COURT:  He's not charged with a 924(c).  I'm

6    saying this theory -- they're tucked away and they can't be

7    used in the course of drug trafficking -- isn't a compelling

8    argument.

9            MR. CLENNON:  There's no evidence of drug trafficking

10   at that time, at that date.

11           THE COURT:  At that very moment, otherwise he's in a

12   house with a whole bunch of -- large quantity of drugs, guns,

13   cash on him, and texts that are suggestive of him facilitating

14   deals.

15           MR. CLENNON:  According to their search warrant

16   application, the operation is run by people knocking and then

17   somebody comes out and they go into the courtyard and do their

18   thing.

19           THE COURT:  Probably with a gun.

20           MR. CLENNON:  Perhaps, but they observed the scene

21   for four months and they didn't see Mr. Frye coming out of 215

22   and doing that kind of activity.

23           THE COURT:  I thought you said they saw him a couple

24   of times.

25           MR. CLENNON:  A couple of times in the area.

1    THE COURT:  Well, he might not have been as integral

2    to the operation, that doesn't mean that he didn't do it on

3    occasion.

4    MR. CLENNON:  The evidence is equally amenable to

5    being interpreted as he's there to get drugs.

6    THE COURT:  Well, what about the government's backup

7    argument, that the plain language of this application note

8    suggests that when you're dealing with a gun, that its

9    proximity to drugs alone is sufficient?  What page number was

10   that on again?

11   MR. SONG:  261, at the bottom.

12   THE COURT:  So it stays:  In the case of a drug

13   trafficking offense.  So, I mean, he's not -- Mr. Song, he's

14   not convicted of the drug trafficking offense here.

15   Mr. Copeland was, right?  But don't you think that this applies

16   to a defendant who's involved in a drug trafficking offense?  I

17   mean, is this not requiring the Court to make the finding that

18   trafficking is defined based on the evidence as a whole in

19   order to apply this application note?

20   You can speak into that microphone.

21   MR. SONG:  This is the commentary to 2K2.1, which

22   only deals with firearms.  So I think that what (ii), what

23   that's referring to, when you're talking about a bump for a

24   drug trafficking offense.  So because the enhancement the

25   government is seeking is under 2K2.1(b)(6)(B), which is on page

1    257, it just says any other felony offense.

2              THE COURT:  So this is saying the other felony

3    offense is a drug trafficking offense.

4              MR. SONG:  Because it's primarily -- this is the

5    commentary to 2K2.1, and 2K2.1 only talks about firearms.

6              THE COURT:  So, Mr. Clennon, why isn't the

7    enhancement warranted here simply because of the proximity of a

8    firearm to the drugs?

9              MR. CLENNON:  Because there's no drug trafficking

10   offense.

11             THE COURT:  But you don't read this language the way

12   the government is suggesting the Court read it in determining

13   the meaning of the word "other offense"?  How would you read

14   it?  Because it's 2K2.1(b)(6)(B), "If the defendant used or

15   possessed any firearm or ammunition in connection with another

16   felony offense."  And so --

17             MR. CLENNON:  There is no other felony offense here

18   except his possession of a gun by a convicted felon.

19             THE COURT:  I would have to find the other offense by

20   a preponderance.  But in doing that, how do you read this

21   language in application note 14(b)(2)(I)?  Would you argue that

22   this only applies in a case in which a defendant is charged

23   with 922(g) and 841, for example?

24             MR. CLENNON:  Yes.  I think that's a reasonable

25   interpretation because we aren't in the case of a drug

1    trafficking offense in which a firearm is found.  We're in the

2    case of a firearm offense.

3            THE COURT:  Right.  But regardless of whether he's

4    been convicted of another offense, you agree that if the Court

5    finds by a preponderance of the evidence that he was engaged in

6    a drug trafficking offense, that this enhancement can apply

7    simply because of the proximity of the gun to the drugs?

8            MR. CLENNON:  I think it can apply, but I don't think

9    that there's evidence that can create a preponderance that he's

10    involved in a drug trafficking offense.  There's speculation,

11    there's observations.  There's no recovery of drugs from him.

12    He's got no drug packaging materials.  The cash is innocent and

13    it's explained by the wagering slips, which the police

14    conveniently omitted from the evidence.

15            THE COURT:  Do you want to show me his statement that

16    he made to the police?

17            MR. CLENNON:  I don't believe he made a statement --

18    oh, Mr. Copeland?

19            THE COURT:  I thought you said that he explained that

20    to the police that day.

21            MR. CLENNON:  No, when the police talked to

22    Mr. Copeland, they explained to him that Mr. Frye had wagering

23    tickets.  They knew that Mr. Copeland was a customer at the

24    wagering spot at Capitol One and so they asked him about his

25    wagering slips, or was he involved in that.

1          THE COURT:  And they specifically referenced

2    Mr. Frye?

3          MR. CLENNON:  Yes.

4          THE COURT:  Do you have a report or anything I can

5    read about this?

6          MR. CLENNON:  No.  All we have is the video and I

7    can't -- they've given me so much material, I can't just put my

8    hands on it.  But I know we both watched it together and he

9    noted it and I noted it.  When he was released, he went back to

10   look for his gambling slips because he thought he had some

11   money coming to him.  They had all been --

12         THE COURT:  If this case had gone to trial,

13   Mr. Clennon, under 404(b), you agree that the government could

14   have sought to introduce his two or three prior drug

15   trafficking offenses to show his intent on that date, right?

16         MR. CLENNON:  They would be admissible, but they're

17   not very probative because they're so many years away.

18         THE COURT:  How many years?

19         MR. CLENNON:  Four, five.

20         THE COURT:  And how long --

21         MR. CLENNON:  He was arrested in 2017, selling drugs

22   without a gun, and successfully completed his probation and was

23   arrested here in November of 2021.  So more than four years

24   later.

25         THE COURT:  When was he released for the 2017?

1           MR. SONG:  January of 2019.

2           THE COURT:  Okay.  So he was out for a few years --

3    four years total from the time of conviction.  I think that's

4    pretty close.  I mean, even under the D.C. Circuit's *Sheffield*

5    case, where they tend to pull in the ten-year limit in 609 into

6    404(b), it's well within that.  So I think it would have been

7    probative for his intent on this occasion.

8           MR. CLENNON:  I mean, 404(b), I guess, is always --

9           THE COURT:  I just read all these texts as a whole

10   and you have an explanation for each one, but when you look at

11   the evidence as a whole, he's in the apartment with drugs.

12   Drugs aren't all tucked away, they're there.  His firearm is

13   there, near the drugs.  He's with these three other people who

14   were --

15          MR. CLENNON:  (Holds up four fingers.)

16          THE COURT:  Four.  Four other people.

17          MR. CLENNON:  One of whom was not arrested and it's

18   her apartment and she's a drug user.

19          THE COURT:  Her apartment, yeah, and that's --

20          MR. CLENNON:  And that's why he's there.

21          THE COURT:  What, are they partners or something?

22          MR. CLENNON:  They're not partners, but when somebody

23   runs a trap house, like she was running, people in the

24   neighborhood congregate there and some of them are drug sellers

25   and many of them are drug users.  I don't know her or her

1    history, but I believe that's why she was in this situation.

2            It's important to note that the government

3    conclusively proved that Mr. Frye's DNA was not on any of the

4    other two guns and none of the other two gentlemen's DNA was on

5    his gun.  But his gun had at least two contributing samples,

6    one of which was 60 percent of all the DNA recovered, and that

7    wasn't him.  His sample was about 30 percent of the DNA

8    recovered off that gun.  And the mixed sample included female

9    DNA.

10            THE COURT:  Okay.  So they're all using the gun.  But

11    my recollection is his priors also involved Mr. Copeland, at

12    least one.

13            MR. CLENNON:  No.

14            THE COURT:  No?

15            MR. CLENNON:  He was arrested in the presence of Mr.

16    Copeland on another --

17            THE COURT:  That was no papered.

18            MR. CLENNON:  -- in 2015 and again in 2021, and the

19    second one was no papered.  The first one in 2015 he was

20    detained for close to nine months, for which he didn't get any

21    credit.  But, during that time, as a skinny one-eyed guy in the

22    jail, he had a shank for self-protection.  That ends up

23    becoming a conviction.  As soon as they found that and

24    prosecuted him for it, the grand jury in the gun case gave a no

25    bill.  They couldn't even get an indictment on it.  So that's

1      like a --

2              THE COURT:  I might agree with you on a beyond a

3      reasonable doubt, maybe, but on a preponderance, I think the

4      government has carried its burden here, looking at the evidence

5      as a whole.  I will impose the four-level enhancement.

6              All right.  So in terms of the guideline

7      calculations, we have the additional four-level enhancement

8      under 2K2.1(b)(6)(B) and that results, after acceptance, in a

9      total offense level of 25.  With a Criminal History Category of

10     III, that's a guideline range of 70 to 87, correct?

11             MR. SONG:  That's correct, Your Honor.

12             THE COURT:  Okay.  All right.  Mr. Song, I'll hear

13     from the government and then from Mr. Clennon and then I'll

14     give Mr. Frye a chance to allocute, if he would like.

15             MR. SONG:  So at this point, Your Honor, we would

16     orally amend or sentencing memo.  We did ask for 84 months, but

17     we did cap our allocation at the bottom of the federal

18     guidelines as determined at the time of sentencing.  So we'll

19     orally amend that to 70 months at this point.

20             THE COURT:  Okay.

21             MR. SONG:  So there are several reasons why we've

22     asked for a bottom of the guideline sentence for Mr. Frye.  I

23     think it's appropriate here because Mr. Frye has been on

24     release and we would be -- you know, notwithstanding some of

25     his issues on pretrial release, I think we would be in a

1    different situation if he, for example, tested positive or was

2    rearrested on another matter.

3                    THE COURT:  What do you make of his, you know, being

4    out today from 5 to 5:15, or whatever, in another apartment

5    building?

6                    MR. SONG:  Understand.  I did see that.  It was

7    recently filed, this morning.  It's -- the only information we

8    have is what was in that petition, it shows that he violated

9    his conditions.

10                   THE COURT:  And they're asking to revoke him.

11                   MR. SONG:  Well, we are asking for incarceration

12   today as well because of his jail-time sentence.

13                   THE COURT:  What, to step him back today?

14                   MR. SONG:  That's correct.

15                   THE COURT:  Even separate and apart from this

16   violation?

17                   MR. SONG:  Yes, as part of his jail -- because we are

18   asking for 70 months of jail time.

19                   THE COURT:  Putting aside this, which I did warn him

20   another violation he would be locked up, I think --

21                   MR. SONG:  That's correct.

22                   THE COURT:  -- is my recollection.  Putting aside

23   that, this is not a -- or is it, an automatic revocation?  I

24   mean, does the Court have to find by clear and convincing

25   evidence that he's not a danger and that he's not a flight risk

```
 1    now?  Like, what --

 2              MR. SONG:  I don't think so, Your Honor.  I don't

 3    think that the Court has to make any findings, actually,

 4    because he would be automatically taken off of pretrial

 5    supervision.

 6              THE COURT:  No, put aside this.  Let's saying we

 7    weren't dealing with a violation --

 8              MR. SONG:  Okay.

 9              THE COURT:  -- and I impose sentence.  Is the

10    government saying it would move to have him committed today --

11              MR. SONG:  Oh, it --

12              THE COURT:  -- under the detention?

13              MR. SONG:  Could I have -- I just need to check

14    briefly what the detention statute says.  I don't believe

15    922(g) is a mandatory --

16              THE COURT:  I don't think it is either.  So that's

17    what I was asking you.  I think the Court would have to find by

18    clear and convincing evidence that he's not -- or, the burden

19    might shift to the defense.  But, still, the issue is whether

20    he's a danger or flight risk.  Anyway, we can address this --

21              MR. SONG:  I apologize.

22              THE COURT:  But you would have been asking for

23    that -- I guess my question is:  You would be asking to step

24    him back even without this violation?

25              MR. SONG:  That's correct, Your Honor.  I think
```

1    that --

2              THE COURT:  So what was the argument you were going

3    to make?

4              MR. SONG:  So the only options for Mr. Frye at this

5    point are self-surrender or to go back to incarceration today.

6    We're at sentencing now and so --

7              THE COURT:  Right.  But, you were just talking about

8    how, with the exception of, you know, some minor things and --

9    I forget how you expressed it -- on pretrial release, you

10   suggested that he's behaved relatively well.

11             MR. SONG:  I was justifying our sentence for the

12   bottom of the guidelines.

13             THE COURT:  Right, right.

14             MR. SONG:  And why we came to that conclusion as part

15   of our plea paperwork.

16             THE COURT:  Right.  And so putting aside the

17   violation this morning, I guess I'm just wondering, what is the

18   argument in favor of committing him today, rather than allowing

19   him to self-surrender, if, in your view, he's been compliant on

20   pretrial release?

21             MR. SONG:  Well, Your Honor -- I'm sorry.  I'm not

22   sure I'm -- so are you asking why he should not be allowed --

23             THE COURT:  -- to self-surrender.

24             MR. SONG:  Okay.  Well, Your Honor, at this point --

25   so, I did not mean to downplay his -- for example, his

1    violations on pretrial release. I didn't mean to say that

2    these are not serious infractions. I know that we were just

3    before the Court at the end of April and we did ask for

4    step-back at that point. I think that we wanted to take a

5    consistent position here. We were concerned back then

6    primarily because of the real large gaps in certain curfew

7    violations. But we assuaged those concerns last time because

8    we all agreed that he would be on home detention for the

9    remainder of his time on pretrial release. And, unfortunately,

10   yet again, he does have another infraction before the Court

11   this morning.

12             I think that given Mr. Frye's background in terms of

13   all of his prior contacts with supervision and how he's been

14   revoked -- I mean, we just had a very lengthy discussion about

15   all of his prior revocations that have occurred in his prior

16   cases. And so for those reasons I do think that step-back

17   today is important, as opposed to a voluntary surrender

18   situation.

19             THE COURT:  Okay.

20             MR. SONG:  So just briefly going through the

21   factors -- I won't belabor it too long because we have had a

22   lengthy discussion this morning just about the overall conduct

23   that Mr. Frye has engaged in. But, one point I did want to

24   bring up is that we think that a sentencing at 70 months would

25   not create a disparity here. Mr. Wade has been sentenced --

1    sorry.

2          THE COURT:  Go ahead.

3          MR. SONG:  Mr. Wade has been sentenced now to five

4    years imprisonment, 60 months.  Mr. Copeland was just sentenced

5    to 144 months, or 12 years.  We think that 70 is appropriate

6    for Mr. Frye because of his specific involvement in this case,

7    his background, how -- you know, his various contacts and

8    various convictions with law enforcement.

9          And, in addition, we did note that Mr. Frye is

10   actually much better positioned than individuals with his

11   similar circumstances.  And what I mean by that is that when we

12   accessed Mr. Wade's phone, we approached Mr. Clennon

13   immediately, in October of 2023, and let him know that we did

14   and let him know that our intention was to pursue a superseding

15   charge before the grand jury and that Mr. Frye, we believed at

16   the time, and still do, is a career offender under the

17   guidelines because of his three prior drug distribution

18   charges -- or, convictions.  Those are paragraph 67, 69, and

19   70.

20         So, you know, we did our guidelines calculation.  If

21   he was convicted of even a simple drug offense, not a 924(c),

22   that his exposure would have been 210 to 262 months, if he was

23   convicted under that --

24         THE COURT:  The drug trafficking?

25         MR. SONG:  That's correct.  If he was convicted on a

1    924(c), he would have been facing 360 to life.  And so it was

2    under that backdrop that we reached the 922(g) plea that's

3    before the Court today.

4            THE COURT:  What about Mr. Clennon's suggestions that

5    you all really didn't see Mr. Frye engage in drug dealing with

6    your surveillance?

7            MR. SONG:  I think that I would not -- we would not

8    be seeking this enhancement if we did not believe that Mr. Frye

9    was involved in --

10           THE COURT:  But how many times was he seen in and

11   around the apartment?

12           MR. SONG:  I mean, Mr. Clennon is correct, it's few.

13   It's probably two.  And the time of surveillance that was in

14   the warrant does cover a lengthy period.  Mr. Frye is not,

15   candidly, not a big player in the establishment of this trap

16   house.  But he still, in our position, was involved in drug

17   trafficking activities.

18           And I want to just also put on the record that

19   another reason why we've reached a bottom of the guidelines

20   allocution for Mr. Frye is that unlike his other codefendants,

21   Mr. Frye does seem to not -- no longer associate with these

22   individuals and has affirmatively moved out of the District of

23   Columbia, for example.

24           THE COURT:  Turned his life around?

25           MR. SONG:  That's correct.  And so I think that,

1    still, the correct place to start is with the guidelines.  And

2    that's exactly why we reached the bottom of the guidelines

3    allocution for Mr. Frye.  I think the -- with respect to a

4    sentencing disparity, as well, we noted in our sentencing memo

5    that Mr. Frye initially refused compliance with the buccal that

6    was being executed.  So if the government wanted, I think we

7    would have been on proper grounds to seek an obstruction bump

8    as well, which we chose affirmatively not to do.

9         So Mr. Frye is actually very well situated, very well

10   situated in comparison with other individuals with similar fact

11   pattern.  Unfortunately, Mr. Frye just has a very long criminal

12   history.  It just puts him at an exposure that's longer than

13   Mr. Wade.

14        THE COURT:  Mr. Wade, didn't you let him plead to

15   924(c)?

16        MR. SONG:  That's correct.  So, for example, if

17   Mr. Frye plead to a 924(c), he would be looking at 360 to life.

18   So we thought that was absolutely inappropriate to have a

19   man -- have a guidelines like that for him.

20        THE COURT:  Do you view his culpability here

21   commensurate with Mr. Wade's?

22        MR. SONG:  I think it's very similar to Mr. Wade's.

23   The conversations, when we were discussing the text messages,

24   there really is a couple of text messages that you just can't

25   get around, even with explanations.  Mr. Frye, for example,

1   offering to bring Mr. Wade yorks, which the government knows to

2   be slang for pills.  They have discussions about pills called

3   10s or 15s.  And 10s or 15s refers to the milligram dosage of

4   an oxycodone pill.  There's talk about promethazine, which was

5   littered throughout the house, as you saw in our memo.

6         But also, I think that, you know, there was a

7   constant relationship between Mr. Frye and Mr. Wade.  I think

8   it's fair to say that Mr. Frye and Mr. Wade were along the

9   same.

10         THE COURT:  And remind me of Mr. Wade's criminal

11  history.

12         MR. SONG:  So Mr. Wade, notably, had a different -- I

13  think he had fewer convictions that Mr. Frye, but Mr. Wade did

14  have a shooting conviction and was also approaching trial for

15  another shooting.  And so he was somewhat different than

16  Mr. Frye, but Mr. Frye absolutely has more convictions than

17  Mr. Wade does.

18         THE COURT:  I'm not going to get into specifics on

19  the record here of materials that were filed under seal, but

20  Mr. Frye's background is one of the more --

21         MR. SONG:  Troubling.

22         THE COURT:  -- traumatic ones the Court has seen in

23  terms of neglect and trauma.  And the government almost always

24  recommends a guideline sentence, but -- I guess your response

25  would be that's taken into account in allowing him to plead to

1    922(g), rather than the career offender enhancements?

2          MR. SONG:  That's correct, as well as the bottom of

3    the guidelines allocation that we're making right now.  And so

4    I don't think -- I do agree, it's troubling, and I don't want

5    to be offensive in any way by not suggesting a downward

6    variance or anything.  I think it is horrible, from what I've

7    read.  But I do think that the guidelines here are reasonable.

8    They take into account a multitude of other factors, including

9    Mr. Frye's involvement in the offense before the Court.  And I

10    do think that the bottom represents the most reasonable outcome

11    for Mr. Frye today.

12          THE COURT:  Okay.  Mr. Song, so under 3143, a

13    defendant, I think, should be detained unless a judicial

14    officer finds by clear and convincing evidence that the person

15    is not likely to flee or pose a danger to the safety of any

16    other person or the community.  I think that's release pending

17    sentence.

18          MR. SONG:  Okay.

19          THE COURT:  So I get the argument that I warned for a

20    number of violations, and he has a violation and that's grounds

21    alone to lock him up.  Do you also think that there's not clear

22    and convincing evidence that he would not be a flight risk or

23    danger to the community?

24          MR. SONG:  I think it's -- I'm not going to stand

25    here and make an argument about danger to the community at this

1    point because he has stayed out of trouble.  What we do have on

2    the record is a lot of infractions on his pretrial release.

3    And I think that's really concerning.  We saw them escalate

4    over -- as we approached sentencing.  Notably, Mr. Frye was

5    doing well on pretrial release right around the beginning of

6    this case and towards the middle, but then his infractions

7    started increasing as we got closer to sentencing.  I think

8    that's an important pattern for the Court to take into

9    consideration and we do think incarceration today is

10   appropriate.  Thank you.

11            THE COURT:  All right.  Mr. Clennon.

12            MR. CLENNON:  Thank you, Your Honor.  I want to begin

13   by talking about this morning.  Mr. Frye took his three young

14   children over to their great aunt's house for baby-sitting.

15   His wife was at work.  She worked the overnight shift until

16   9:30.  She came here from work, as soon as she got off.  There

17   was nobody home at 6 o'clock this morning when he had to catch

18   the commuter bus to come to court and so he took the kids over

19   to their aunt's house.  It's a technical violation, it's an

20   innocent violation.  And if he had texted Mr. Copes or called

21   him at 5:30 and said this is what I have to do, it would not

22   have been a violation.

23            THE COURT:  Why didn't he do that?

24            MR. CLENNON:  I don't think that -- he doesn't have a

25   phone.  I've been dealing with, for the last week, trying to

1    communicate and get these documents to him and he's got to

2    borrow other people's phones to make a phone call.  We were

3    able to arrange a personal visit Tuesday and got through all

4    the documents.  But I couldn't really call him at will and say,

5    well, what about this, what about that?  It's -- but we got it

6    all together this morning.

7            He couldn't call Mr. Copes and tell him that he went

8    over to the adjacent building a couple days ago to use the

9    public computer to read the stuff that they filed Monday night.

10    I emailed Mr. Copes and I directed my client to go to the

11    computer to read the stuff --

12            THE COURT:  I'm glad you did that.

13            MR. CLENNON:  -- apparently that was enough.  If I

14    had known there was a child care thing this morning, I could

15    have done the same thing.

16            Mr. Frye does ask the Court to consider voluntary

17    surrender.  I think you made the correct legal ruling at the

18    time of the guilty plea and he hasn't engaged in any activity

19    since then to convince the Court otherwise.  I don't know if it

20    would involve an unavoidable expense to him that he can't

21    manage.  I haven't figured out those details.  If he could

22    voluntarily surrender to the cellblock, that would be awesome.

23    But I think he would try to get it together, if he is given

24    that opportunity.  I think he's earned it.

25            His wife's letter has really described what happened

1    to him in the last couple years.  His last period of

2    incarceration was when his first child was born.  When he got

3    out, in 2019, he didn't completely go off drugs.  He didn't

4    completely shape up, but he shaped up substantially.  And

5    then -- and his wife and him have had a little trouble recently

6    and in the past, but they've worked it out and they're raising

7    their kids.

8           When his son was born with autism and chronic

9    gastrointestinal issues that required expert treatment and

10   biweekly visits to the doctor in Philadelphia and tube feeding

11   and that kind of stuff, he's become a dad.  He puts the kids to

12   bed and makes them dinner and he's living a life that he's

13   never lived as an adult.  He's been sober for the first time in

14   his life and his thinking is clarified and he actually is the

15   new person that his wife describes in her letter.

16          Mr. Frye has been -- he's been punished a lot for not

17   really that much activity.  He got a two-year sentence when he

18   was 18 years old for his first conviction.  He didn't get any

19   probation.  And because of his lack of parental guidance and

20   his lack of programming and lack of skill, he was able to turn

21   that two years into five years based on all the various

22   revocations that occurred to him.  And that sentence ended nine

23   years after the case was initiated, in 2019.

24          So, yes, he's had a very troubled upbringing and the

25   environment that he chose to hang out in as an adult was not a

1    positive one.  But the most important thing to remember is he's

2    not part of a violent drug gang and he's not involved in any

3    violent activities at all.  He's not -- the gun he was found

4    with is not linked to any activities.  He's never been accused

5    of violent activity in the community and -- because he's just

6    not that type of person.

7          He carries -- he needs -- he feels the need for

8    protection simply because he's -- doesn't have all the physical

9    abilities that most men of his age do.  He's got one eye and

10   doesn't have a lot of skills.  And I don't believe he's

11   received the special education services he's probably entitled

12   to, but the psychoeducational studies were never performed.

13         Grief counseling, all of that stuff was recommended,

14   mentoring, all of that.  Every six months they went back for a

15   review hearing and talked about all that stuff, but it never

16   happened and within six months of him becoming an adult he's in

17   prison.

18         He's overcome a lot.  He's been punished a lot.  And

19   a below-guidelines sentence, a variance to reflect the fact

20   that he's turned himself around immensely, and even without the

21   enhancement, a 46-month sentence would still be the longest

22   sentence he's ever been sentenced to and so it does provide the

23   deterrent that the government feels is necessary and it would

24   serve the purposes of sentencing in his particular case.  The

25   guidelines are mechanistic, they can't really apply

1    mathematically to every single person without ignoring every

2    single person's background and history and characteristics.

3    And Mr. Frye is a fairly typical example of the type of client

4    that I've been representing for the last 40 years.  And the

5    agencies that we entrusted Mr. Frye to as a child just didn't

6    perform and he's on his own.  And he's done pretty well, to

7    still be alive and have kids and employment opportunities.

8            He's come a long way and I think the Court should

9    recognize that.  And 46 months is more than sufficient to deter

10   him and to, certainly, to punish him.  I know I grew up in an

11   open-carry state --

12           THE COURT:  You what?

13           MR. CLENNON:  I grew up in an open-carry state and

14   everyone has guns everywhere all the time and it's just normal.

15           THE COURT:  Well, he -- I hear you, but I hope and

16   I'm encouraged by the fact that Mr. Frye has moved out of the

17   area where he was surrounded by a lot of violence.  But he

18   cannot carry a firearm anymore.  He gets caught with a firearm,

19   the next time he will be deemed a career offender and he's not

20   going to get another break.

21           MR. CLENNON:  Right.  He's never really gotten a

22   break, but --

23           THE COURT:  This time he got a break.  He could have

24   been a 924(c).  I mean, maybe he would have beat the charge,

25   but he cannot afford --

1          MR. CLENNON:  He would have been in better shape

2     pleading to a 924(c) because he would have been facing 60

3     months instead of 70.

4          THE COURT:  The enhancements under ACCA would apply.

5          MR. CLENNON:  I don't think the four-point

6     enhancement can apply to a 924(c) --

7          THE COURT:  Mr. Song?

8          MR. SONG:  To reiterate --

9          MR. CLENNON:  -- because they didn't ask for it for

10    Mr. Wade.

11         MR. SONG:  We're discussing the career offender.

12    He's got three convictions that qualify him as a career

13    offender.  So if he were convicted of a subsequent drug

14    offense, he would be looking at 360 to life.

15         THE COURT:  But when I asked you why didn't he plead

16    to the 924(c), why didn't you offer him that?

17         MR. SONG:  Because he would look at 360 to life and

18    we did not feel that that was an appropriate sentence for

19    Mr. Frye.

20         THE COURT:  Because of the enhancements that apply,

21    right, Mr. Clennon?

22         MR. CLENNON:  No.  I think he's saying 924(c) would

23    qualify him as a career offender.

24         MR. SONG:  I can explain.  So, Mr. -- due to his

25    prior convictions in 67, 68, and 69, he's already a career

```
1     offender.
2              THE COURT:  Right.
3              MR. SONG:  Because all you need is two prior
4     convictions on drug distribution charges, and he has those.
5              THE COURT:  Or crimes of violence, yes.
6              MR. SONG:  So no crimes of violence.  But if he does
7     have those predicate distribution charges, if he was even
8     convicted of drug trafficking without a firearm, that would
9     move him to the end of the --
10             THE COURT:  I understand.  But just the 924(c) plea.
11             MR. SONG:  360 to life.
12             THE COURT:  Because?
13             MR. SONG:  Because his criminal history category
14    would move all the way to the end and his guidelines would go
15    up.
16             THE COURT:  Isn't that the Armed Career Criminal Act?
17             MR. SONG:  No, that's just the career offender.
18             THE COURT:  Career offender takes over with 924(c)
19    alone?
20             MR. SONG:  Yes.
21             THE COURT:  Because it is a crime of violence.
22             MR. CLENNON:  924(c)?
23             THE COURT:  I don't know.  Kind of regardless --
24             MR. CLENNON:  The answer -- our answer to that is
25    that, really, it's a false comparison.  I think you sort of
```

1    acknowledge that it might not be beyond a reasonable doubt, but

2    it's certainly a preponderance.  Well, for the same reasons he

3    wouldn't, I don't believe, have actually faced a conviction in

4    a 821 --

5              THE COURT:  841.

6              MR. CLENNON:  851, any drug offense.  I don't think

7    he would have been convicted of drug trafficking based on this

8    evidence.  He's not a member of the conspiracy, he doesn't have

9    any gang insignia, he's not in any of the group photos that

10   they put in any of their warrants, he's got no controlled buys.

11             THE COURT:  I think the text are problematic.  But I

12   hear you.  But you did plead because you thought it was a good

13   deal and it was a big risk to roll that dice.  And what I'm

14   saying now -- and this is more for Mr. Frye's benefit and I

15   think I've said it to him already -- is good for you for

16   turning your life around.  I cannot emphasize enough how you

17   cannot touch firearms or drugs or commit a violent assault,

18   anything like that, because the government will look at your

19   record as having received breaks that you shouldn't have

20   received and the next time you're in a situation where you're

21   looking at 360 to life, and no one wants to see that.

22             I hear you, that he seems to have turned the corner,

23   and I'm just doing all I can to emphasize to him just how

24   serious a matter this is, that this is not -- when you get out

25   of jail in however many years, oh, I could make a quick X

1    amount of money to help my family is not worth it because they

2    potentially will lose you for life.  That's the only point I'm

3    making, Mr. Clennon, it's just -- he's on thin ice moving

4    forward.  He has got to stay law-abiding.

5              MR. CLENNON:  I think he understands that and I think

6    he'll tell the Court that.  I don't want to go on, but I want

7    to make a couple quick points.  I don't think Mr. Wade is the

8    only one to compare against in terms of proportionality.

9    Mr. Copeland has five times as much culpability in his two

10   different --

11             THE COURT:  And I sentenced him to 12 years, so --

12             MR. CLENNON:  Right.  And so even asking for more

13   than half of that is excessive.  I would point the Court to at

14   least two recent cases.  I'm having a little trouble finding my

15   paperwork here.  In the *United States versus Marshall*,

16   concluded last year, maybe this year, there was, like, 18

17   codefendants, it was a typical drug conspiracy with fentanyl.

18   Mr. Marshall was charged with conspiracy to distribute more

19   than 400 grams of fentanyl.  I believe his criminal history was

20   about four points and he was afforded an 11(c)(1)(C) for five

21   to eight years.

22             *United States versus Murray* --

23             THE COURT:  What was his sentence?

24             MR. CLENNON:  I'm sorry?

25             THE COURT:  What was his sentence?

1          MR. CLENNON:  I don't think he's been sentenced yet.

2     I think he just entered the plea.

3          (Off-the-record discussion between the Court and

4     Courtroom Deputy.)

5          THE COURT:  Sorry, Mr. Clennon.

6          MR. CLENNON:  And the other one I can think of

7     offhand is *United States versus Murray*.  He just entered a

8     plea -- it's a four-codefendant fentanyl conspiracy case.

9     Mr. Murray was found with two guns on two separate occasions,

10    27 grams of crack on one occasion, and involvement in the

11    fentanyl undercover sales on video.  His criminal history was

12    9 points and he was given a 924(c).

13         So I think there are -- the Court probably is aware

14    that there are plenty of drug-involved individuals with a lot

15    more culpability than Mr. Frye who have received sentences in

16    that range of 70 to 80 months.

17         So I believe 70 is excessive for this particular case

18    and for this particular defendant and would urge the Court to

19    grant a downward variance in recognition of his rehabilitative

20    efforts and his rehabilitative potential and his substantial

21    family responsibilities.  Thank you.

22         THE COURT:  All right.  Thank you, Mr. Clennon.

23         Mr. Frye, would you like to address the Court?  This

24    is your opportunity to speak, if you would like to do so.  If

25    so, come up to the podium, please.

```
 1          THE DEFENDANT:  Yeah, I just like to apologize to
 2   everyone here, my family, my kids, my wife.  Bad situations
 3   I've made in the past.  Definitely learned a lot from it.  Been
 4   sober.  Three working jobs, looking for opportunity, second
 5   chance.
 6          THE COURT:  Sounds like you've been working really
 7   hard.
 8          THE DEFENDANT:  Yeah, trying to be better and just
 9   stay away from -- stay away from negativity and stuff that can
10   land me in trouble and just focus on my family and my life and
11   continue to be better.
12          THE COURT:  How -- I know Mr. Frye had a horrific
13   experience in childhood and I know you've struggled with
14   depression, where are you with that now?
15          THE DEFENDANT:  I mean, I been focusing, just staying
16   strong and realizing what life is about and things and just
17   fighting every day to just become better and just look for more
18   opportunity, stay wise, read spiritually immensely, and just
19   motivate myself to never go back, you know, bad decisions I've
20   made.
21          THE COURT:  Is the pull in the neighborhood just too
22   strong?
23          THE DEFENDANT:  Ha?
24          THE COURT:  Is the -- in the neighborhood where you
25   were, was it just too hard to resist the way to make quick
```

```
 1    money?
 2              THE DEFENDANT:  Just was lost, Your Honor.  This was
 3    just bad guidance and just -- I don't know.  Since I've been
 4    out of that, though, I moved, been away, I ain't really been,
 5    like, going back down that road.  I've been, like, focused on a
 6    different life, different path.  So neighborhood definitely
 7    traumatized me and brainwash your -- just, like, while living
 8    down there.  But I ain't been down that road in a few years.
 9              THE COURT:  What do you think you want to do when you
10    get out?
11              THE DEFENDANT:  Raise my kids, travel the world, be
12    better.  Help youth, help people been through what I've been
13    through as a child.
14              THE COURT:  Is there any specific kind of vocational
15    training you're interested in?
16              THE DEFENDANT:  It really just -- challenge and
17    change with youth.  I started something with it, like basically
18    helping the youth coming up and showing them there's a better
19    way of life to live out of the neighborhood and communities in
20    D.C., Maryland.
21              THE COURT:  Have you talked with your attorney about
22    the Bureau of Prisons facility you would like to be assigned
23    to, if the Court were to make a recommendation?  Is there a
24    particular place that you think would be --
25              THE DEFENDANT:  Fort Dix.  I told him Fort Dix, if
```

1      I'm eligible for Fort Dix.  Like a low, medium facility.

2              MR. CLENNON:  He's mentioned Fort Dix and FCI

3      Petersburg.

4              THE COURT:  Given that this is a gun offense,

5      Mr. Frye, you won't be eligible for a reduction in sentence.

6      Makes no sense, but you won't be eligible for a reduction of

7      your sentence for completing the residential drug treatment

8      program.  But I would strongly encourage you to participate in

9      that while you're incarcerated, even though your sentence won't

10     be reduced because -- given your history.  It's a good program,

11     I think you could get a lot out of it.  And, you know, you

12     have, it appears, turned your life around and you can continue

13     that in prison.

14              I know it's going to be hard, but you're going to

15     have to take advantage of the opportunities that are offered in

16     terms of programming.  I know you want your GED, and that may

17     be tough.  The learning support is not what it should be in

18     prisons, but I hope there's vocational opportunities.  And it's

19     just, you know, important that you continue to stay positive

20     and seize on those opportunities you are offered in there to

21     make your adjustment easier in terms of getting qualified for

22     different licenses and that kind of thing.

23              All right.  But I will order reentry program within

24     60 days of your release and at that time I'm going to want to

25     hear what you completed in prison.  All right?

```
1                THE DEFENDANT:  Okay.

2                THE COURT:  Because you will be on a period of

3      supervision and the purpose of that is not to catch you doing

4      something and, you know -- because anyone wants to lock you up

5      again, it's to help make the transition easier and for you to

6      have the support, whether it's mental health or drug treatment

7      or anything like that, any -- you haven't been supported in the

8      past, and that's part of probation's role when you get out, it

9      really is, in the federal system.

10               THE DEFENDANT:  Um-hum.

11               THE COURT:  So I look forward to seeing you upon your

12     release and hearing what you've done.  And I'm incredibly sorry

13     for the tragic circumstances you've faced.  The system's failed

14     you, family failed you, society failed you.  And it's

15     impressive and inspiring to see how you're turning your life

16     around and giving your kids a different life.

17               THE DEFENDANT:  Yeah.

18               THE COURT:  And I don't mean to keep giving you these

19     warnings, but, really, in those weak moments when you want to

20     make quick cash, you just got to stay away because the risk is

21     too high.

22               THE DEFENDANT:  I understand.

23               THE COURT:  All right.  Okay.  Any reason why

24     sentence can't be imposed?

25               MR. CLENNON:  No, Your Honor.
```

1          THE COURT:  All right.  You can have a seat, sir.

2     Thank you.

3          All right.  This is an extremely, extremely difficult

4     case.  On the one hand, Mr. Frye has pled guilty to a very

5     serious offense involving a firearm.  And there is evidence

6     before the Court that he was in fact engaging in drug dealing,

7     although, admittedly, the government says, not to the degree of

8     some of the others he was arrested with.

9          But, given the text messages and the money that was

10    found on his person, given the amount of dangerous drugs that

11    were found in the apartment, including crack cocaine and over

12    450 pills, including fentanyl, approximately 48 grams, as well

13    as three firearms, one of which was linked to Mr. Frye, his

14    DNA, the Court does reach that conclusion.  And just as

15    additional evidence of intent, the Court does point out

16    Mr. Frye's three prior drug-related -- drug-trafficking related

17    convictions.

18         As the government noted, Mr. Frye does qualify as a

19    career offender with his three prior drug convictions, even

20    without this conviction.  And as the Court said multiple times,

21    if Mr. Frye were to commit a crime of violence or drug

22    trafficking offense, he will be subject to, as the government

23    says, probably 360 months to life.  So Mr. Frye was given a

24    break by the government in being allowed to plead to felon in

25    possession offense alone.

1           As the Court stated, it's highly sympathetic to

2   Mr. Frye's struggles as a child.  He was failed in

3   extraordinary ways and it's little wonder, given the extreme

4   neglect and trauma he experienced, that he dropped out of

5   school, that he used drugs to treat his depression, and that he

6   resorted to drug dealing to fund his habit and also to support

7   himself.  His mother had severe mental issues, his father had

8   his own issues.  Mr. Frye was essentially left to raise

9   himself, without any support from the family, or really from

10  the child neglect and abuse system, and it's baffling and truly

11  tragic beyond words.

12          I am enormously encouraged by the letter from

13  Mr. Frye's wife.  Thank you for that letter.  It sounds as if

14  Mr. Frye really has stepped up and helped her a great deal with

15  her children, particularly the youngest, he struggles with

16  serious disabilities.  There's no doubt that she could use

17  continuing help right now, but the crime he committed here is a

18  serious one and he's going to have to serve a term of

19  imprisonment before he can return to being the father I know he

20  wants to be.

21          The government is recommending a 70-month sentence

22  and I do appreciate what the government is saying about the

23  break that Mr. Frye received in this case.  But, the Court is

24  going to vary.  In addition, to take into account the extreme

25  poverty, neglect, and trauma he experienced as a child, I am

1    also basing the sentence I'm imposing in part on the need to

2    diminish unwarranted sentencing disparities and, notably, the

3    60-month sentence that the Court gave Mr. Wade I know is for a

4    different offense, was a 924(c), but in terms of this offense,

5    it does seem that their culpability was equivalent, so I will

6    vary and sentence Mr. Frye to 60 months in prison.

7              I'll read the formal sentence of the Court and then

8    I'll give each side a chance to object before I impose the

9    sentence.

10             Pursuant to the Sentencing Reform Act of 1984 and in

11   consideration of the provisions of Title 18 United States Code

12   Section 3553, it is the judgment of the Court that you, Leroy

13   Frye, are hereby committed to the custody of the Bureau of

14   Prisons for a term of 60 months in prison on Count 7.  You're

15   further sentenced to serve 36 months -- three-year -- term of

16   supervised release on Count 7.  In addition, you're ordered to

17   pay a special assessment of $100.  While on supervision, you

18   shall abide by the mandatory conditions, as well as the

19   discretionary conditions recommended by the probation office in

20   part D of the presentence report.

21             And, Mr. Clennon, you've reviewed those with

22   Mr. Frye, I don't need to review them here, the discretionary

23   conditions that are listed in the presentence report?

24             MR. CLENNON:  Yes, Your Honor.

25             THE COURT:  Okay.  The mandatory conditions include

1    not committing another federal, state, or local crime, not

2    unlawfully possessing a controlled substance, refraining from

3    any unlawful use of a controlled substance, and submitting to a

4    drug test within 15 days of placement on supervision, and at

5    least two follow-up drug tests thereafter.  You must also

6    cooperate in the collection of DNA.

7            In addition, you must submit to substance abuse

8    testing to determine if you've used a prohibited substance.

9    You must not attempt to obstruct or tamper with the testing

10   methods.  You must participate in an inpatient or outpatient

11   substance abuse program and follow the rules and regulations of

12   that program as directed by a probation officer.  You must also

13   participate in a mental health program and follow the rules and

14   regulations of the program as well.  The probation office, in

15   consultation with the treatment provider, will supervise your

16   participation.

17           The Court finds you don't have the ability to pay a

18   fine and waives imposition of a fine in this case.  Special

19   assessment is due immediately.

20           The Court will order a reentry hearing within 60 days

21   of release, with a report prior to that hearing updating the

22   Court on Mr. Frye's reentry.

23           Pursuant to Federal Rules of Criminal Procedure

24   32.2(a) and Title 21, United States Code 853(a) you, Mr. Frye,

25   shall forfeit the property constituting or derived from any

1    proceeds obtained directly or indirectly as a result of these

2    offenses, any property used or intended to be used in any

3    manner to commit or facilitate the commission of these

4    offenses.

5              That, Mr. Song, I take it, includes the gun, as well

6    as the money on his person?

7              MR. SONG:  That's correct, Your Honor.

8              THE COURT:  And the probation office shall release

9    the presentence investigation report to all appropriate

10   agencies, and that includes the probation office in the

11   approved district of residence.  Treatment agency shall return

12   the presentence report to the probation office upon Mr. Frye's

13   completion or termination from treatment.

14             Mr. Frye, you can appeal your conviction to the U.S.

15   Court of Appeals for the D.C. Circuit if you believe your

16   guilty plea was somehow unlawful or involuntary or if there's

17   some other fundamental defect in the proceedings that was not

18   waived in your plea agreement.  Under some circumstances the

19   defendant also has the right to appeal the sentence to the D.C.

20   Circuit.  The defendant may waive that right as part of the

21   plea agreement, however, and you've entered into a plea

22   agreement which waives some of the rights to appeal the

23   sentence itself.

24             Such waivers are generally enforceable, but if you

25   believe the waiver is not valid, can under present that theory

1    before the Court.  Under 28 U.S.C. Section 2255, you also have

2    the right to challenge the conviction entered or the sentence

3    imposed to the extent permitted by that statute and your plea

4    agreement.  Any notice of appeal must be filed within 14 days

5    of the entry of judgment.

6            Is there any objection from the government to the

7    sentence as announced?

8            MR. SONG:  No, Your Honor.

9            THE COURT:  From the defense -- you want to make a

10   recommendation of Fort Dix?

11           MR. CLENNON:  Yes, Your Honor.  And voluntary

12   surrender.  And I renew my objections made to the calculations,

13   but --

14           THE COURT:  Okay.  Those objections are noted for the

15   record.  And let me just say, to the extent the Court was wrong

16   with regard to the calculation of the guidelines, the Court

17   does believe the sentence of 60 months is sufficient but not

18   greater than necessary to achieve the purposes of sentencing,

19   including to provide adequate deterrence and punishment,

20   incapacitation and rehabilitation for Mr. Frye.  So the court

21   does believe that that sentence is the right one, particularly

22   taking into account the codefendants in this case.

23           I'll recommend Fort Dix.  And was there a backup

24   prison?

25           MR. CLENNON:  FCI Petersburg.

1          THE COURT:  FCI Petersburg.  Okay.  I'll make those

2    two recommendations.  In light of the explanation, which the

3    Court does find credible, about why Mr. Frye was not in his

4    apartment this morning, the Court will not revoke his release

5    because the Court does find by clear and convincing evidence,

6    based on Mr. Frye's record on pretrial release, he has had some

7    violations, but there were explanations for those.  And since

8    those violations, Mr. Frye has been very compliant with

9    pretrial release.

10          So, Mr. Frye, I am allowing you to self-surrender.

11    And, Mr. Clennon, I would suggest that you just talk to

12    probation about the easiest way for him to do that.  But,

13    Mr. Frye, I'm going to repeat again, I don't want another one

14    of these violation reports.  All right?  Because I understand

15    it's hard to contact your officer, but you've got to do that.

16    All right?  If I get another one of these, you're going to be

17    revoked.

18          THE DEFENDANT:  Okay.

19          THE COURT:  All right.  I understand today was a

20    unique circumstance, but you've got to think ahead and make

21    arrangements for that.

22          So, Mr. Clennon, as it stands now, he will report as

23    directed by probation.

24          THE PROBATION OFFICER:  Yes, Your Honor.  I'll go

25    over the voluntary surrender instructions with him after the

1     hearing.

2              THE COURT:  Okay.  All right.  Are there any

3     remaining counts that need to be dismissed?

4              MR. SONG:  Not against Mr. Frye.

5              THE COURT:  Okay.  Mr. Hopkins likes the government

6     to make this motion because he's concerned that a detainer will

7     stay the complaint or something else.  So to the extent there's

8     any remaining charges, is there a motion to dismiss them?

9              MR. SONG:  The government will move to dismiss them.

10              THE COURT:  All right.  Without objection, the Court

11     will dismiss them, for Mr. Hopkins' benefit.

12              THE COURTROOM DEPUTY:  Thank you.

13              THE COURT:  Mr. Frye, the Court looks forward to

14     seeing you upon your release.

15              THE DEFENDANT:  Okay.

16              MR. SONG:  Thank you, Your Honor.

17              (Recess.)

18              THE COURT:  Can you recall it?  Can you recall the

19     case?

20              THE COURTROOM DEPUTY:  We're recalling criminal

21     action 22-378-4, *United States versus Leroy Frye*.

22              Your Honor, all parties who were previously before

23     the Court are now currently before the Court.

24              THE COURT:  Mr. Frye, sorry to bring you back in

25     here, but I just realized, when I was giving you your appeal

1    rights --

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  -- I neglected to tell you that if you --

4    you have 14 days to file any appeal and if you're unable to

5    afford the cost of appeal, you may request permission from the

6    Court to file an appeal without cost to you, and on appeal you

7    may also apply for court-appointed counsel.  All right.  That's

8    important that you know that.

9                    THE DEFENDANT:  Okay.

10                   THE COURT:  That's it.  All right.  Thank you.

11                   MR. CLENNON:  Thank you, Your Honor.

12                              *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                        Dated this 9th day of March, 2025

8

9

10                        /s/_____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25